UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
NIRLANDE AUGUSTIN,            )
                              )
          Plaintiff,          )
                              )
v.                            )          Civil Action
                              )          No. 18-10761-PBS
NANCY A. BERRYHILL,           )
Acting Commissioner of Social )
Security Administration,      )
                              )
          Defendant.          )
_____)
```

**MEMORANDUM AND ORDER**

April 23, 2019

Saris, C.J.

**INTRODUCTION**

Plaintiff Nirlande Augustin brings this action under 42
U.S.C. § 405(g) for judicial review of a final decision denying
her applications for Social Security Disability Insurance and
Supplemental Security Income benefits. She claims that the
Administrative Law Judge ("ALJ") erred by failing to find that
she has a listed impairment, misweighing the medical opinions,
and improperly concluding she can perform light office work.

For the following reasons, the Court **ALLOWS** Plaintiff's
motion to reverse the Commissioner's decision (Docket No. 12)
and **DENIES** Defendant's motion to affirm the Commissioner's
decision (Docket No. 13).

## FACTUAL BACKGROUND

The following facts are taken from the administrative record. Plaintiff is a single, 62-year-old female. R. 40. She lives with one of her children in Everett, Massachusetts. Id. Her claim for disability benefits is based on her sickle cell disease, breast cancer, and left shoulder subtotal tear/ avascular necrosis. R. 19-20.

## I.  Educational and Work History

Plaintiff earned a high school diploma and received some vocational training. R. 40. She worked as a legal secretary at New England Life until the mid-1980s. R. 165. She stopped working due to her sickle cell disease, moved to Florida, and received disability benefits for ten years. Id. She worked from 2000 to 2010 as a legal secretary at a Miami law firm. Id. During 2011, 2012, and 2014, she was self-employed as a part-time French translator and personal care attendant and companion for elderly clients. R. 45-46, 165. After her diagnosis of breast cancer in 2015, she moved from Miami back to Boston for her medical care. R. 426.

## II. Medical History

At age sixteen, Plaintiff was diagnosed with sickle cell disease. Id. She began taking folic acid and iron around this time, though not consistently. R. 440. During the twenty-nine years she lived in Miami, she was hospitalized about ten times.

Id. For example, in February 2015, she was hospitalized for chest, back, knee, and arm pain associated with her sickle cell disease. R. 426.

In March 2015, Plaintiff was diagnosed with breast cancer. R. 342. On April 29, 2015, she underwent a right modified radical mastectomy to remove the cancer. R. 374-75. There were no immediate complications from the procedure, and her surgeon indicated one week later that she exhibited full range of motion of her entire arm. R. 340-41.

On June 27, 2015, after moving to Boston, Plaintiff went to the Lawrence Memorial Hospital emergency room complaining of shortness of breath and right-sided chest pain. R. 382, 384. She informed the attending physician that she had been doing reasonably well since her surgery two months earlier. R. 386. The physician found that she was severely anemic. R. 382. Her symptoms improved after she was rehydrated and transfused with two units of blood. Id. She remained in the hospital for three days. Id.

Plaintiff met with oncologist Dr. Dejan Juric at the Massachusetts General Hospital ("MGH") on July 17, 2015 to discuss her breast cancer. R. 405-06. She reported some fatigue and intermittent tightness in her right chest wall, but denied any frank pain, shortness of breath, dyspnea on exertion, bone pain, or joint pain. R. 405. She declined chemotherapy to reduce

her risk of recurrence because she worried that, in conjunction with her sickle cell disease, the chemotherapy would render her completely unable to function. R. 51, 406.

Plaintiff saw a hematologist at MGH, Dr. Rachel Rosovsky, on December 7, 2015 for her sickle cell disease. R. 440-43. She told Dr. Rosovsky that her energy levels were "okay" but had decreased over the past two years. R. 441. She reported no pain. R. 441-42. Plaintiff said she was not consistently taking her folic acid and iron to treat her sickle cell disease and did not know how many sickle cell crises she had per year. Id.

Three weeks later, Plaintiff returned to Dr. Rosovsky. She reported that she had been taking her iron and folic acid daily since the last visit and that she was okay but felt fatigued often. R. 436. Plaintiff refused to take any pain medication stronger than Motrin. R. 439. Dr. Rosovsky encouraged Plaintiff to start taking a prescription drug called Hydra for her sickle cell disease, which she said she would consider. Id.

On January 4, 2016, Plaintiff met with Dr. Anne Moulton, her primary care physician at MGH. R. 434-35. Plaintiff reported no pain, though she appeared tired. R. 434. She also saw Dr. Rosovsky the same day. R. 426-30. She reported feeling weak all over and had taken 600mg of Motrin the evening before to prevent a sickle cell crisis. R. 427. She stated that she was taking folic acid and iron more regularly. Id. Dr. Rosovsky again

recommended that Plaintiff start taking Hydrea.[1] R. 430.
Plaintiff was transferred to the emergency department to receive
a transfusion of one unit of red blood cells, but she left later
that night before receiving the transfusion. R. 423, 431.

On February 29, 2016, she visited a nurse practitioner
complaining of fatigue, feeling like she was going to pass out
after basic tasks, and right arm numbness. R. 462. The nurse
practitioner noted that Plaintiff was inconsistently taking her
folic acid. R. 463-64. She arranged for Plaintiff to receive a
blood transfusion. R. 463.

On April 1, 2016, Plaintiff visited Dr. Juric to discuss
her breast cancer. R. 452-54. She reported significant fatigue
and intermittent chest wall tightness but no pain. R. 452-53.
Dr. Juric counseled her to take Hydrea regularly for her sickle
cell and advised her to undergo chemotherapy to reduce the risk
of cancer recurrence; again, she declined both. R. 454.

Plaintiff met with Dr. Rosovsky the same day. R. 455-60.
She told her she was tired all the time and took naps a lot but
her fatigue was better than before. R. 456. She noted that she
was still inconsistent in taking her folic acid and iron. Id.

---

[1]   Hydrea, also known as Hydroxyurea, is an antimetabolite
medication used to treat certain types of cancer and reduce the
frequency of crises in patients with sickle cell anemia.

Dr. Rosovsky strongly encouraged her again to take Hydrea, but Plaintiff decided not to do so. R. 460.

Plaintiff returned to Dr. Juric on July 15, 2016. R. 477-80. He again tried to convince Plaintiff to undergo chemotherapy to reduce her risk of breast cancer recurrence, but she declined. R. 477. He also emphasized the importance of taking Hydrea daily for her sickle cell disease. Id. At the appointment, she reported significant fatigue and intermittent chest tightness. R. 478. Dr. Juric noted that Plaintiff was restricted in her ability to perform physically strenuous activity but that she was ambulatory and able to carry out work of a light or sedentary nature, such as light house work and office work. Id.

Five days later, Plaintiff followed up with Dr. Rosovsky. R. 469-75. She said she was feeling "quite well," although she was still not consistent with her medications. R. 470. She reported occasional back or neck pain and said she took Motrin when this occurred, which helped the flare-ups subside within three days. Id. She said she was still tired, though not all the time, and that her fatigue was better. Id. She said that she took occasional naps during the day, but not as often as before. Id. She denied any pain, except for an occasional slight twinge in her left shoulder with movement. Id. She reported shortness of breath with one flight of stairs only when her sickle cell

disease flared up. Id. Dr. Rosovsky again strongly recommended
that Plaintiff take Hydrea. R. 475.

Plaintiff saw Dr. Moulton on August 23, 2016 for left arm
pain she first noticed while putting on coats in the late
winter. R. 476. She told Dr. Moulton that her arm hurt whenever
she reached for anything and that she had been unable to sleep
on her left side for a month. Id. Her arm hurt much more when
she was moving than when she was at rest. Id. She was not
dropping anything because of the pain, and ibuprofen helped "a
little." Id. Dr. Moulton ordered an MRI of Plaintiff's left
shoulder. Id. The MRI revealed avascular necrosis of the humeral
head and a subtotal tear of the anterior fibers of the
supraspinatus. R. 465. At an appointment a few months later,
Plaintiff reported pain at an eight out of ten but refused
medication and did not want to see orthopedics. R. 484. She
stated that she had a similar issue with her other shoulder
twenty years earlier. Id.

Plaintiff visited Dr. Juric again on October 4, 2016. R.
480-84. She reported some fatigue, intermittent chest wall
tightness, and some left shoulder pain, but no other bone or
joint pain. R. 482. Dr. Juric again discussed the utility of
taking Hydrea to control her sickle cell disease, but Plaintiff
refused to do so. R. 480. He again noted that Plaintiff was able
to carry out work of a light or sedentary nature. R. 482.

On October 17, 2016, Plaintiff followed up with Dr. Rosovsky. R. 485-92. She reported feeling "quite well" but noted that she was tired all the time and took occasional naps during the day. R. 487. Dr. Rosovsky recorded her fatigue as "moderate to severe." R. 488. Plaintiff told Dr. Rosovsky that she was taking her folic acid and iron every day. R. 487. She stated that she took Motrin when she had neck and back pain that signaled a flare-up of her sickle cell disease. Id. Dr. Rosovsky again strongly advised Plaintiff to start Hydrea, which Plaintiff said she would continue to consider. R. 491.

## III. **Medical Opinions**

In an undated letter, Dr. Moulton stated that Plaintiff has sickle cell disease "with all of the secondary manifestations," "exceedingly painful" aseptic necrosis of her left shoulder, "extreme fatigue," and "pain and decreased range of motion" in her right arm. R. 494. This problem was discussed at an October 5, 2016 office visit. She also noted Plaintiff's 2015 diagnosis of breast cancer, as well as the fact that Plaintiff "gets fatigued and short of breath with limited exertion and has difficulty performing many activities of daily living." Id. She opined that, due to her "chronic sickle cell disease with complications and newly diagnosed breast cancer," Plaintiff "is unable to work because she is permanently disabled" and should receive disability benefits. Id.

In an August 10, 2017 letter, Dr. Juric stated that
Plaintiff has "a recent history of aggressive and poorly
differentiated carcinoma of the right breast, requiring ride-
sided modified radical mastectomy with extensive axillary lymph
node dissection." R. 9. He also noted her "sickle cell anemia
complicated by pain crises and avascular necrosis of the left
humeral head." Id. He opined that "[d]ue to these comorbidities,
she is no longer able to work and cannot support herself,
requiring provision of disability benefits, indefinitely." Id.

On September 8, 2015, Dr. Lawrence Schaffzin, an
ophthalmologist and state agency medical consultant, reviewed
Plaintiff's medical records but did not examine her. R. 61-69.
He opined that Plaintiff's sickle cell disease and breast cancer
produced her pain and other symptoms. R. 65-66. Nevertheless, he
found that she could occasionally lift or carry twenty pounds
and climb ladders, ropes, or scaffolds; frequently lift or carry
ten pounds, climb stairs or ramps, stoop, kneel, crouch, and
crawl; and stand, walk, or sit for a total of six hours during
an eight-hour workday. R. 66-67. He opined that these
limitations would not prevent her from working in her former
profession as a secretary. R. 68. On review on February 2, 2016,
Dr. James Grim, a neurologist and state agency medical
consultant, reached essentially the same result. R. 81-89.

## IV.  **Vocational Expert's Testimony**

At the hearing before the ALJ, Ruth Baruch, a vocational expert, testified about Plaintiff's work ability. She opined that a hypothetical person with the abilities Dr. Schaffzin and Dr. Grim ascribed to Plaintiff could work as a legal secretary or in other light clerical jobs. R. 56-57. She said that a similar person who was off task twenty percent of the workday due to fatigue and pain or absent from work two days per month would not be able to do any work in the local and national economy. R. 58-59.

## V.  **Plaintiff's Testimony**

At the hearing, Plaintiff testified that she feels pain and numbness almost every day in her arm. R. 42. She does not lift anything because of the pain and finds it difficult to reach for a towel in the bathroom or overhead with her hands. R. 44. She takes Motrin to control her pain. R. 48-49. She also testified that she feels very fatigued, needs a few hours to get out of bed every morning, and must lie down most of the day. R. 43, 54. She cannot make all her meals for herself and requires an hour or two to make a simple breakfast of eggs when she does cook. R. 43-44, 53. She does not do many errands or chores around the house, such as laundry or grocery shopping. R. 44. She cannot stand or walk for long periods of time, and she needs someone to help her return to her room after taking a shower. R. 43. She

also regularly has shortness of breath and other breathing problems. R. 53. Plaintiff stated that she does not use stronger pain medication, Hydrea, or chemotherapy because she does not want to throw up and feel even more fatigued all the time. R. 51.

## LEGAL STANDARD

Under the Social Security Act, a claimant seeking benefits must prove that she is disabled, i.e., unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner uses a five-step sequential evaluation process to assess a claim for disability benefits. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Purdy v. Berryhill, 887 F.3d 7, 9-10 (1st Cir. 2018). The evaluation ends at any step if the Commissioner finds that the claimant is or is not disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are as follows:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the claimant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" ["RFC"] is such that he or she can still perform past relevant work, the application is denied; and 5) if the

applicant, given his or her [RFC], education, work
experience, and age, is unable to do any other work,
the application is granted."

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5

(1st Cir. 2001)). A claimant's RFC is "the most [the claimant]

can still do despite [her] limitations." 20 C.F.R.

§§ 404.1545(a)(1), 416.945(a)(1). Past relevant work encompasses

"work that [the claimant has] done within the past 15 years,

that was substantial gainful activity, and that lasted long

enough for [her] to learn to do it." Id. §§ 404.1560(b)(1),

416.960(b)(1). If a claimant cannot still perform her past

relevant work, the ALJ will assess whether there is any other

work the claimant "can adjust to" that "exist[s] in significant

numbers in the national economy." Id. §§ 404.1560(c)(1),

416.960(c)(1).

        The claimant bears the burden of proof for steps one

through four. Purdy, 887 F.3d at 9. If the analysis proceeds to

step five, the Government bears the burden of proof to present

evidence of specific jobs the applicant can perform. Id. at 10.

### AGENCY DECISION

        Plaintiff filed her applications for Social Security

Disability Insurance and Supplemental Security Income benefits

on June 11, 2015, claiming disability beginning January 1, 2013.

R. 17. The claim was denied on September 24, 2015 and again upon

reconsideration on February 19, 2016. R. 17, 101-03. ALJ Sujata
Rodgers held a hearing on March 22, 2017. R. 34.

On May 23, 2017, the ALJ issued her decision, which again
denied Plaintiff's disability claim. R. 17-29. At step one of
the five-step disability evaluation process, the ALJ found that
Plaintiff had not engaged in substantial gainful activity since
January 1, 2013, the alleged onset date. R. 19. At step two, she
found that Plaintiff's sickle cell anemia, status post breast
cancer, and left shoulder subtotal tear constituted severe
impairments. R. 19-20. At step three, she found that none of
Plaintiff's impairments, alone or in combination, met or equaled
a listed impairment under 20 C.F.R. Part 404, Subpart P,
Appendix 1. R. 20. She specifically ruled out impairments under
Listing 7.05, which includes sickle cell disease, and Listing
13.10, which includes breast cancer. Id.

The ALJ proceeded to determine Plaintiff's RFC. R. 20-27.
She accorded great weight to the assessments of the state agency
non-examining medical physicians that Plaintiff was able to do
light exertional work, which she found consistent with the
evidence in the medical records. R. 25-26. She rejected the
assessment of Dr. Moulton, Plaintiff's primary care physician,
that Plaintiff could not work because her letter was conclusory
and did not list any specific physical residual functional
limitations. Id. The ALJ concluded that, although Plaintiff's

impairments did impact her ability to work, they did not render her disabled. R. 26. She pointed specifically to the everyday activities Plaintiff could perform, including caring for herself, shopping, taking care of her finances, and socializing with others as evidence that she could perform some work. Id. She also found that Plaintiff's medical records showed that her diagnostic tests and examinations were generally "unremarkable despite [her] reluctance to adhere to treatment and/or prescribed medication." Id. The ALJ found the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. She can sit, stand, or walk for 6 hours each in an 8-hour workday. She can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can occasionally climb ladders, ropes, and scaffolds. She can occasionally reach overhead with bilateral upper extremities.

R. 20.

At step four, the ALJ relied on the vocational expert's testimony to find that Plaintiff was capable of returning to her past relevant work as a legal secretary. R. 27. Alternatively, at step five, the ALJ found that Plaintiff could perform a significant number of jobs existing in the national economy, such as office clerk, file clerk, or mail clerk. R. 27-28. The ALJ determined Plaintiff was not disabled and denied her claim. R. 29.

Plaintiff made a timely request for review of the ALJ's
decision by the Appeals Council of the Social Security
Administration. R. 11. The Appeals Council denied the request on
February 20, 2018, making the ALJ's decision the final decision
of the Commissioner. R. 1-6. The case is now ripe for review
under 42 U.S.C. §§ 405(g) and 1383(c)(3).

**STANDARD OF REVIEW**

A district court reviews an ALJ's decision "to determine
'whether the final decision is supported by substantial evidence
and whether the correct legal standard was used'." Coskery v.
Berryhill, 892 F.3d 1, 3 (1st Cir. 2018) (quoting Seavey, 276
F.3d at 9). The substantial evidence standard is "not high" and
requires only "such relevant evidence as a reasonable mind might
accept as adequate to support [the] conclusion." Biestek v.
Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison
Co. v. NLRB, 305 U.S. 197, 229 (1938)). "In applying the
'substantial evidence' standard, the Court must bear in mind
that it is the province of the ALJ, not the Court, to find
facts, decide issues of credibility, draw inferences from the
record, and resolve conflicts in the evidence." Johnson v.
Colvin, 204 F. Supp. 3d 396, 407 (D. Mass. 2016) (citing
Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st
Cir. 1991)).

15

In reviewing for legal error, "[f]ailure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." Weiler v. Shalala, 922 F. Supp. 689, 694 (D. Mass. 1996). Where application of the correct legal standard could lead to a different conclusion, the agency's decision must be remanded. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000). However, remand is not necessary if it "will amount to no more than an empty exercise." Id.

## DISCUSSION

Plaintiff assails the ALJ's decision in four respects: 1) failing to find that she has a listed impairment that qualifies her as disabled under step three; 2) giving too much weight to the non-examining state agency medical consultants' opinions and insufficient weight to the opinion of Dr. Moulton, her primary care physician; 3) ignoring her chronic pain syndrome; and 4) finding that she has an RFC to perform light work. The Court concludes that the ALJ failed to properly weigh the medical opinions, which requires the case be remanded for a new hearing. Therefore, the Court does not address Plaintiff's other three arguments.

Under the applicable regulations, a "medical source" is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law." 20 C.F.R. §§ 404.1502(d), 416.902(i). An "acceptable medical source" includes a "licensed physician." Id. §§ 404.1502(a)(1), 416.902(a)(1). A "treating source" is an "acceptable medical source who provides [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." Id. §§ 404.1527(a)(2), 416.927(a)(2). Dr. Moulton qualifies as a treating source because she is a primary care physician who saw Plaintiff at multiple appointments over the course of nine months.

The ALJ must give "[c]ontrolling weight . . . to a treating physician's opinion on the nature and severity of a claimant's impairments if the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence' in the record." Johnson, 204 F. Supp. 3d at 409 (quoting 20 C.F.R. § 404.1527(c)(2)). Even if not given controlling weight, a treating source's medical opinion generally receives more weight

than opinions from other medical sources. 20 C.F.R.

§§ 404.1527(c)(2), 416.927(c)(2); <u>Purdy</u>, 887 F.3d at 13.[2]

   That said, a number of factors determine the appropriate weight to give to the opinions of treating and other medical sources. 20 C.F.R. §§ 404.1527(c), 416.927(c). For all sources, the ALJ must consider whether the source examined the claimant, the support the source provides for her opinion, the consistency of the opinion with the record as a whole, and the specialty of the source. <u>Id.</u> For a treating source, the length, nature, and extent of the treatment relationship and frequency of examination are also relevant considerations. <u>Id.</u> §§ 404.1527(c)(2)(i)-(ii), 416.927(c)(2)(i)-(ii). An ALJ need not expressly address each factor identified by the regulations but must provide "good reasons" for the weight assigned to the opinion of a treating source. <u>Bourinot v. Colvin</u>, 95 F. Supp. 3d 161, 177 (D. Mass. 2015); <u>see also</u> 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

   The ALJ did not provide good reasons for her weighing of the medical opinions. She gave great weight to the opinions of the non-examining state agency medical consultants because they

---

[2]    20 C.F.R. §§ 404.1520c, 416.920c contain new rules regarding the weight given to treating sources that apply to claims filed on March 27, 2017 or later. <u>See</u> <u>Purdy</u>, 887 F.3d at 13. Because Plaintiff filed her claim on June 11, 2015, the old rules govern this appeal.

were consistent with Plaintiff's medical records. She accorded little weight to the opinions of Dr. Moulton, Plaintiff's primary care physician and a treating source, which she deemed inconsistent with the medical records. The ALJ did not mention, however, that Dr. Schaffzin and Dr. Grim provided their opinions based on incomplete medical records that did not reflect Plaintiff's condition as of the date of Dr. Moulton's opinion

In Soto-Cedeño v. Astrue, the First Circuit held that an assessment performed by the claimant's treating physician could not be "reasonably characterized as 'inconsistent' with the other medical evidence in record" where the assessment and other medical evidence were from "different time periods." 380 F. App'x 1, 2 (1st Cir. 2010) (per curiam). Specifically, the First Circuit found that a "current" assessment was not contradicted by the evaluations of consulting physicians performed more than a year earlier. Id. This case is factually similar. Dr. Schaffzin and Dr. Grim submitted their evaluations on September 8, 2015 and February 2, 2016, respectively. The record contains treatment notes going through October 2016, around when Dr. Moulton's opinion was written. Especially given that Dr. Schaffzin and Dr. Grim did not examine Plaintiff and do not specialize in hematology, oncology, or primary care, their older evaluations do not support the conclusion that Dr. Moulton's opinion, made with the benefit of almost a year-long treatment

relationship, was inconsistent with the objective record. See
id. Accordingly, the ALJ did not have substantial evidence for
her weighing of the medical opinions.

Plaintiff did not submit an opinion from Dr. Juric until
she appealed her case to the Appeals Council, so the ALJ did not
consider it. For the purposes of remand, however, the Court
notes that the record contains even less evidence to discount
Dr. Juric's opinion since he wrote his letter in August 2017,
almost two years after Dr. Schaffzin's report.

Since the ALJ did not sufficiently justify giving little
weight to Dr. Moulton's opinion, remand is required. Lemieux v.
Berryhill, 323 F. Supp. 3d 224, 229 (D. Mass. 2018); see also
Linehan v. Berryhill, 320 F. Supp. 3d 304, 306 (D. Mass. 2018)
("A goal of the treating source rule is to function as a
procedural safeguard. Where . . . the Court cannot ascertain 'a
clear understanding of why the ALJ rejected [the treating
doctor's] opinion,' the goal of the treating source rule is not
met." (second alteration in original) (citation omitted)
(quoting Francis v. Comm'r Soc. Sec. Admin., 414 F. App'x 802,
804 (6th Cir. 2011))). Properly weighing the opinions of the
medical sources, the ALJ could well have reached a different
conclusion regarding Plaintiff's RFC. See Ward, 211 F.3d at 656.[3]

---

[3]     The Court notes that Plaintiff has consistently refused to
take Hydrea or follow other treatment recommendations from her

**ORDER**

Accordingly, the Court **ALLOWS** Plaintiff's motion to reverse the Commissioner's decision (Docket No. 12) and **DENIES** Defendant's motion to affirm the Commissioner's decision (Docket No. 13).

SO ORDERED.

/s/ PATTI B. SARIS          .
Hon. Patti B. Saris
Chief U.S. District Judge

---

physicians because she is worried the medication will make her fatigued and nauseous. On remand, the ALJ may consider this justification in determining the weight to give to her treating sources' opinions, see Johnson, 204 F. Supp. 3d at 410, and/or her testimony about the severity of her symptoms, see Coskery, 892 F.3d at 6.